IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Fred Michael Reed,

                Plaintiff,

    v.

International Painters
And Allied Trades
Industry Pension Plan,

                Defendant.

Case No. 2:12-CV-72

Judge Graham

Magistrate Judge Deavers

**OPINION AND ORDER**

**I.      Background**

Plaintiff Fred Reid[1] brought this action as authorized by the Employee Retirement Income Security Act of 1974 ("ERISA"), asserting two claims in his complaint: one, for benefits under 29 U.S.C. § 1132(a)(1)(B), and two, for equitable estoppel under 29 U.S.C. § 1132(a)(3). The matter is before the Court on Reid's Motion for Judgment on the Administrative Record on Count I, (Doc. 40), and the International Painters and Allied Trades Industry Pension Plan's ("IUPAT") Motion for Summary Judgment on Counts I and II. (Doc. 37).

This case is about whether or not Fred Reid's pension vested before he left the employ of union painting companies and became an over-the-road truck driver. Reid worked for various employers within the jurisdiction of Local 1275 from, at the latest, 1968[2] to 1979. In 1979, Local 1275 merged with IUPAT. In 1982, Reid stopped working as a union painter and became an over-the-road truck driver. Reid returned to union employment in 1999, reaching normal

---

[1] While Plaintiff's name is spelled "Reed" in the case caption and on the docket, the record indicates the Plaintiff's name is Fred "Reid."
[2] The parties dispute the year Reid joined Local 1275: Reid asserts it was 1965; IUPAT asserts it was 1968.

retirement age in 2011. Reid applied for his pension and learned that IUPAT would not credit his years of service from the mid-1960s to 1982 towards his pension because he incurred a "permanent break in service" and his pension had not vested when this occurred.

Under the terms of the pension plans, a participant loses credit for years of service if they leave union employment for an extended period of time. (IUPAT Plan, doc. 40-2 at 49–50; Local 1275 Plan, doc. 40-2 at 10–11). But, a participant in either plan can avoid this result by accruing 10 years of service before an extended break; by accruing 10 years of service, the participant's accumulated pension "vests." (Doc. 40-2 at 18, 47). Reid left union employment in 1982 and incurred a break in service that canceled his earned pension credits *unless* his pension was already vested.

On Reid's denial-of-benefits claim, the Court must determine whether the IUPAT Administrator's decision was arbitrary and capricious. The facts germane to this inquiry include: (1) the Administrator's decision to deny benefits, (2) the details of the two pension plans and the merger agreement, and (3) Reid's employment history. Some of those facts are germane to Reid's equitable estoppel claim as well.

A.     IUPAT's Decision to Deny Benefits

In 2005, Reid inquired about his pension. IUPAT informed him that he did not qualify for benefits. (Doc. 40-1 at 72). Reid and IUPAT exchanged correspondence for a number of years, Reid retained counsel, IUPAT officially denied him an increased pension, Reid appealed, and IUPAT denied his claim for the last time in 2013. (*Id.* at 63–66).

Throughout the administrative-appeal process, IUPAT consistently found that Reid accrued only 5.6 of the requisite 10 years of vesting service under the Local 1275 plan at the time of the merger with IUPAT. (*Id.* at 63, 72, 79). IUPAT determined Reid accrued 5.6 years

2

from what it purports to be a Local 1275 summary of union members' service. (*Id.* at 68). To supplement this piece of evidence, IUPAT created a "Service Record," reconstructing Reid's employment history by using his Social Security earnings reports. It shows Reid's annual wages from each of his employers. (*Id.* at 24–29). By dividing Reid's annual earnings by estimated hourly wages, IUPAT derived an estimate of Reid's total hours worked. (*Id.* at 69) (i.e. $1,436.35 income in 1969 divided by an estimated hourly wage of $9.56 equals 150 hours worked).

Reid disputes IUPAT's estimate of Reid's hourly wages, and the case turns on this issue. Reid submitted his own "Service Record" with an estimated wage history and hour calculations, calculating 9.4 years of service under the Local 1275 plan. (*Id.* at 33, 64).[3] Reid recalled some specific wage rates throughout his employment history and appears to have interpolated the unknown wages. (Aff. of Fred Reid, doc. 37-8).

In its final decision, IUPAT dismissed Reid's estimates and evidence of his employment history.

> Participant provided a revised analysis of his Social Security earnings report with different wage rates. The revised rate of $9.99 matches the contract rates for January – October 1977 of the years for which contract records remain. However, the wage rate assumed after the merger is clearly wrong and grossly overstates hours that are properly reflected at lower levels in Fund records. Participant also assumes no loss of 1965 credit and that all painting companies that were ever union contributed to the Local 1275 Plan during his entire work life. These assumptions are contradicted by the Local 1275 Plan and post-merger IUPAT Plan records with much lower credit. A reduction of 9/10 year of [sic] with different assumptions or corrections would eliminate any potential vested benefit. The revised analysis is an after-the-fact creation whose assumptions cannot adequately be verified to show a material error in Local 1275 Plan records.

(Doc. 40-1 at 64).

---

[3] Frustratingly, the only recitation of this is in IUPAT's correspondence with Reid; nowhere in his briefs does Reid show how he (or IUPAT) calculated his service at 9.4 years.

**B.**     **Pension Plans and Merger Agreement**

Discussion of both plans is warranted because under ERISA, an employee with 3 years or more of service may vest under the rules of either of two available plans, whichever is more beneficial. 29 U.S.C. § 1053; (IUPAT Decision, Doc. 40-1 at 65).

**1.  Merger Agreement**

The merger between Local 1275 and IUPAT is a critical juncture of this case. Section 4.02 of the unions' Merger Agreement promises that those participants whose pensions vested under the Local 1275 plan would be vested under the IUPAT Plan. (Doc. 40-2 at 60). Section 4.03 of the Merger Agreement requires Local 1275 employees to work for 1,800 hours or accrue 12 "credits" after the merger to qualify for benefits under the IUPAT Plan. (*Id.*).

Reid argues that an oral promise made by Richard Meyers (the "Meyers Promise") precipitated the merger. Allegedly, the Meyers Promise was this: if the members of Local 1275 voted for the merger with IUPAT, IUPAT would credit each member with a full year's worth of service for every year of *membership* with Local 1275. (Doc. 40 at 4) (emphasis added). The alleged Meyers Promise is found nowhere in the merger agreement.

**2. Local 1275 Plan**

Reid originally worked under the Local 1275 Plan. The Local 1275 Plan required participants to complete 10 or more "Credited Vesting Service Years" for participants' pensions to vest. (Doc. 40-2 at 18). A "Credited Vesting Service Year" is a year in which the participant worked more than 1000 vesting hours. (*Id.* at 3, 6). In a year in which a participant worked less than 1000 hours, each 100 hours worked counted for 1/10 of a year. (*Id.* at 6).  The Local 1275 Plan also contemplates absence from union employment due to military service as a "special

service." If the employee returned to union employment within 90 days after the military service, the absence did not negatively affect the employee's pension benefits. (*Id.* at 5).

### 3. IUPAT Plan

The IUPAT plan contains a few key provisions. Pension Credit may be canceled. (Doc. 40-2 at 49). Participants receive credit for service prior to the Contribution Period. (*Id.*). The IUPAT plan also outlines the procedure for determining prior service when detailed employment records are unavailable. "The Board of Trustees may, in its absolute discretion, consider and rely upon any relevant and material evidence, including": (1) employers' records, (2) social security records, and (3) union records. (*Id.*). Section 4.05 describes the process of accruing "Years of Vesting Service." (*Id.*). To accrue one year of vesting service, a participant must work 1,000 hours of covered employment in the calendar year. (*Id.*). Participants must accrue 10 years of vesting service to avoid cancelation of their pension credits following a break in service. (*Id.* at 49–50).

### C. Employment History

The parties have argued different totals for the number of hours and years of vesting service throughout the course of this litigation. The Court here does its best to collect all those varying totals. The contemporaneous evidence on the issue is quite thin, so the parties present dueling employment-history reconstructions.

The only document that purports to record Reid's actual years of employment is a barely legible printout, which indicates that Reid accumulated 5.6 years of service before the merger with IUPAT. (Doc. 40 at 2). Other than this printout, the parties use conflicting interpretations of Reid's Social Security earnings reports to reconstruct his work history. IUPAT reconstructed Reid's hours by taking a wage of which it was certain—$13.62 per hour in 1981—and

extrapolating back in linear fashion to simulate wage increases of 3% per year. (Doc. 40-1 at 69–71). By this linear reconstruction, IUPAT estimates Reid earned 5.3 years of service before the merger. (*Id.*). This, IUPAT argues, corroborates the 5.6 years of service shown in the printout.

Reid points the Court to paragraphs 25 through 39 of his affidavit for evidence that he worked sufficient hours to become vested. (Pl.'s Mot. for J. on the Admin. R., doc. 40 at 9). Reid argues that he accumulated many more years of pre-merger service than IUPAT claims, by his account, 9.4 years. (*Id.*). This number appears to come from Reid's own, very different, analysis of his Social Security earnings reports. (*Id.* at 9–10). While Reid cannot recollect every wage he earned at every job since 1965, he does recall several—$3.63 per hour in 1965, $4.02½ per hour in 1968, and $5.55 per hour in 1970. (Doc 40-1, at 30). By way of contrast, IUPAT's estimates of Reid's wages during those same years are $8.49 per hour in 1965, $9.28 per hour in 1968, and $9.84 per hour in 1970. (*Id.*). Reid submitted his own "Service Record," in which Reid asserts he worked 16,279 hours before the merger. (*Id.* at 33). Although not entirely clear, it seems that Reid used his estimated wages and his Social Security earnings reports to calculate his total pre-merger hours at 16,279.

IUPAT's claims regarding Reid's post-merger hours vary: (1) "there is no Fund record of 1,800 Contributory Hours for Participant after the merger," (*Id.* at 65); (2) "the additional post-merger service would add only 1.4 years," (*Id.* at 65); or (3) "Participant earned 1,859.70 Benefit Hours . . . under the IUPAT Plan from 1979 to 1982." (*Id.* at 80). Reid also makes inconsistent claims regarding his number of post-merger hours: (1) 1,561 according to his handwritten log, (*Id.* at 33); or (2) 1859.2 according to his amended "Service Record." (*Id.* at 30).

To summarize, the parties' positions on the precisely the number of hours Reid worked is unclear. The parties present different interpretations of Reid's Social Security earnings reports, each of which, if accepted as true, would support the position of the party that offered it.

## II.        Applicable Legal Standards

Summary judgment procedures are inappropriate when district courts perform a de novo review of a denial of benefits under ERISA. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998) (Gilman, J., concurring in part and rendering the judgment of the court on the issue of the summary judgment standard). *Wilkins* suggested guidelines for ERISA cases, such as to "conduct a de novo review" and render findings of fact and conclusions of law accordingly. *Id.* Some courts do this even if not reviewing de novo but under the arbitrary and capricious standard. *See, e.g.*, *Andrews v. Prudential Ins. Co. Of Am.*, No. 08-14391, 2009 WL 4506445, at *1 (E.D. Mich. Dec. 2, 2009). When presented with a motion for summary judgment in the ERISA context, the Sixth Circuit combines the arbitrary-and-capricious standard with the summary-judgment standard. *See Farhner v. United Transp. Union Discipline Income Protection Program*, 645 F.3d 338, 342–43 (6th Cir. 2011) (determining "whether there is any genuine issue of material fact as to whether the Plan Administrator's actions were arbitrary and capricious."). While this area of the law remains murky, what is clear from *Wilkins* is (1) for denial-of-benefits claims, the Court reviews only the facts as they appear in the administrative record, *Wilkins*, 150 F.3d at 615, and (2) the Court should adjudicate IUPAT's "Motion for Summary Judgment" as a Motion for Judgment on the Administrative Record. *See id.* at 619 (Gilman, J., concurring).

Reid's equitable estoppel claim is governed by standard summary judgment procedures. *See Stark v. Mars, Inc.*, 879 F. Supp. 2d 752, 756 (S.D. Ohio 2012), *aff'd*, 518 F. App'x 477 (6th Cir. 2013).

### A. Standards of Review

#### 1. Denial of Benefits

"[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When vested with discretionary authority, courts generally defer to the plan administrator, reviewing only whether the administrator's decision was arbitrary and capricious. *Id.*; *see also Cox v. Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009). Reid concedes that IUPAT does have discretionary authority to interpret the plan. (Pl.'s Resp. in Opp'n, doc. 42 at 3). Reid concedes this point because the plain language of the plan says, among other things, that the "Trustees shall have the exclusive right and discretionary authority to construe the terms of the Plan[.]" (Doc. 37-21 at 65–66). Therefore, IUPAT's decision will only be overturned if it is arbitrary and capricious.

Reid bears the burden of proving that IUPAT's decision was arbitrary and capricious. *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 343 (6th Cir. 2011). "A plan administrator's decision will not be deemed arbitrary and capricious so long as it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome." *Price v. Bd. of Trs. of Indiana Laborer's Pension Fund*, 707 F.3d 647, 651 (6th Cir. 2013) (quoting *Haus v. Bechtel Jacobs Co., LLC*, 491 F.3d 557, 561–62 (6th Cir. 2007)) (internal quotation marks omitted). "Under this standard, we uphold the administrator's decision 'if it is

the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Helfman v. GE Grp. Life Assur. Co.*, 573 F.3d 383, 392 (6th Cir. 2009) (quoting *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 552 (6th Cir. 2008)). Substantial evidence means that "the plan administrator's decision was rational in light of the plan's provisions," *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997); *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003), or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hurse v. Hartford Life & Accident Ins. Co.*, 77 F. App'x. 310, 318 (6th Cir. 2003). One example of an arbitrary and capricious decision is where the plan administrator cherry-picks evidence to support its claim while ignoring countervailing evidence. *See Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 361–62 (6th Cir. 2002) (basing decision on one report that was "inherently flawed").

Alternatively described as a "factor" or a "temper" in our review of a plan administrator's decision, the Court should assess conflicts of interest even when reviewing under the arbitrary-and-capricious standard. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008); *DeLisle v. Sun Life Assur. Co. of Canada*, 558 F.3d 440, 444–45 (6th Cir. 2009). The most obvious conflict of interest arises when a for-profit plan can increase profit by denying claims for benefits. Such a conflict requires the Court to more closely scrutinize the plan administrator's decision regarding benefits. *Cox*, 585 F.3d at 289. However, simply because plan authorities have "responsibility for ensuring that the Plan remains properly funded" does not necessarily mean they labor under a conflict of interest. *Klein v. Cent. States, Se. & Sw. Areas Health & Welfare Plan*, 346 F. App'x 1, 5 (6th Cir. 2009). A plaintiff must show that the administrator's decision "was motivated by its alleged conflict of interest." *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007); *see also Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998).

Reid presents some evidence that IUPAT is in a dangerous financial position. (Dep. Of Gary Meyers, doc. 39-1 at 7–8). Reid argues that this could motivate IUPAT to deny claims; IUPAT argues that any conflict of interest is not a material factor in our review. The fact that the Plan seeks to remain properly funded is not sufficient to show this motivated the administrator's decision. *Klein*, 346 F. App'x at 5.

Reid argues that IUPAT's decision making alone is indirect evidence from which the Court can infer that the conflict of interest affected IUPAT's decision making. (Doc. 40 at 3–4). Reid reasons that the Court should closely scrutinize poorly reasoned decisions because from that poor reasoning one can infer bias. Of course, every claimant appealing a denial of benefits disagrees with the reasoning of the plan administrator. For the Court to find a conflict of interest because the administrator's reasoning was poor would essentially bootstrap the decision on the conflict-of-interest issue into our review on the merits—and render the whole discussion quite circular, and useless to the Court. In any event, no evidence exists in the record to show that the conflict of interest that Reid asserts motivated the administrator's decision. Accordingly, the alleged conflict of interest is entitled to scant weight in the review process.

### 2. Equitable Estoppel

Summary judgment may not be the proper procedural vehicle for disposing of a denial-of-benefits claim, *see Wilkins*, 150 F.3d at 619, but summary judgment is appropriate for Reid's equitable-estoppel claim. *See Stark*, 518 F. App'x at 480. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . by showing that the materials cited do not establish the absence or

presence of a genuine dispute, or [by demonstrating] that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B). In considering a motion for summary judgment, the Court must draw all reasonable inferences and view all evidence in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Am. Express Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 688 (6th Cir. 2011).

The moving party has the burden of proving the absence of a genuine dispute and its entitlement to summary judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party's burden of showing the lack of a genuine dispute can be discharged by showing that the nonmoving party has failed to establish an essential element of his case, for which he bears the ultimate burden of proof at trial. *Id.* Once the moving party meets its initial burden, the non-movant must set forth specific facts showing that there is a genuine dispute for trial. *Id.* at 322 n.3. "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294, 298 (6th Cir. 2008). A fact is "material" only when it might affect the outcome of the suit under the governing law. *Id.*; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

III.       **Discussion**

On his denial-of-benefits claim, Reid argues that he was vested under the Local 1275 Plan, and that by virtue of the Meyers Promise, he was also vested under the IUPAT Plan. IUPAT argues that the Administrator's decision to deny benefits was not arbitrary and capricious. Since the Court finds that the decision by the Administrator was arbitrary and

capricious, the Court will deny IUPAT's Motion for Summary Judgment. But since the Court lacks the factual basis to find that Reid is entitled to benefits, the Court will deny Reid's Motion for Judgment on the Administrative Record and remand the case to the Administrator. The Court will Grant IUPAT's Motion for Summary Judgment as to Reid's equitable-estoppel claim.

### A.    Denial of Benefits

The parties' central dispute is whether Reid's pension was vested before he left union employment. Because Reid accrued 3 years of service, he is entitled to vest under the rules of either plan, whichever is more favorable. 29 U.S.C. § 1053(c). First, Reid argues that the evidence submitted to IUPAT showed that he was vested, and that IUPAT's decision to ignore this evidence was arbitrary and capricious. (*See* Doc. 40 at 8–16). Second, Reid argues that his pension vested by the operation of the Meyers Promise. (*Id.* at 16–22). IUPAT counters, arguing that Reid did not vest under the IUPAT Plan before 1983 and did not vest under the Local 1275 Plan before 1983. (Def.'s Resp. at 10–15, Doc. 37-1). Whether Reid accrued the necessary 10 years for his pension to vest is unclear; however, the Administrator's decision—that he did not accrue 10 years of service—is not supported by substantial evidence and not the result of a deliberate, principled reasoning process.

To start, the Court must look at IUPAT's decision. In its decision, IUPAT maintains that the Local 1275 printout showing Reid had accrued only 5.6 hours at the time of the merger is the most reliable record of Reid's work history. (Doc. 40-1 at 65). In contrast, Reid claims to have accrued 9.4 years of service before the merger. In its decision, IUPAT concedes that Reid accrued at least a total of 7.0 years of service. (*Id.*) ("additional post-merger service would add only 1.4 years"). It also concedes that, if Reid's estimate of 9.4 years of pre-merger service is

correct, this plus his post-merger hours would "bring him over ten (10) vesting years under the rules of the Local 1275 Plan." (*Id.* at 64).

IUPAT's decision to reject Reid's wage reconstruction rests on six bases: (1) the wage rate assumed after the merger is contradicted by Fund records, (2) Reid should not receive any credit for 1965 employment, (3) Plan records show that the union painting companies listed in the service record were not all contributing employers to the Local 1275 Plan when they employed Reid, (4) if Reid's calculation of 9.4 years of service is improperly inflated by just 0.9 years, his pension would not vest, (5) no wage reconstruction can override the contemporaneous record of Reid's employment from the printout because it cannot be adequately verified, and (6) IUPAT's wage reconstruction that shows 5.3 years of pre-merger service is reliable corroborating evidence of the printout. (*Id.*). Since a principled reasoning process would not produce any of the six bases upon which the Administrator relied in rejecting Reid's dueling "Service Record," the Administrator's decision is arbitrary and capricious.

### 1. The wage rate assumed after the merger is contradicted by Fund records.

Reid does not dispute the records of post-merger work history, (Doc. 40 at 16), and it is unclear to the Court what post-merger wage rates Reid assumed in compiling his "Service Record." But IUPAT itself makes conflicting statements as to Reid's post-merger work history. (Doc. 40-1 at 65, 80). Further, even assuming that Reid's post-merger estimates are erroneous, they have minimal impact on IUPAT's denial of benefits because IUPAT concedes that Reid accrued at least 1.4 years of service after the merger. On remand, IUPAT should clearly define how many hours it finds Reid worked before and after the merger, citing the evidence it relies upon in making such a finding.

## 2. Reid should not receive any credit for 1965 employment.

Again, the Administrator offers no reasoned analysis for why Reid should not receive credit for union employment in 1965. The Administrator flatly states that Reid's assumption that he should receive credit for 1965 employment is contradicted by the records of the various Plans. (*Id.* at 64). The Social Security records do show a break in service, but that break was due to military service. Under the Local 1275 Plan, "if a Participant fails to earn 100 Vesting Hours due to Special Service, then such Plan Year shall not cause a Divesting Service Year." (Doc. 40-2 at 3). Special Service includes "military absence, provided that the Participant returns to Covered Employment within ninety (90) days after the end of the period in which his reemployment rights are protected." (*Id.* at 5).

The Court finds no evidence to prove or disprove whether Reid returned to union employment within 90 days after ending his military service, so this break in service provides no reasonable basis to deny credit for 1965 employment. The Social Security earnings reports are, at least, evidence that Reid returned to painting jobs shortly after completing his military service. (Doc. 40-1 at 25). Even if Reid did lose all credit for his 1965 service, this would divest him of approximately 450 hours or 0.4 years of service at the most, and this amount is not by itself dispositive of Reid's claim.[4] On remand, the Administrator should cite the evidence showing that Reid's 1965 service should be divested.

---

[4] The Court acknowledges IUPAT's arguments that at least one of the employers in 1965 was a non-contributing employer. (Def.'s Mot. for Summ. J., doc. 37-1 at 20–21; Resp. of Def., doc. 41 at 3). However, most of the evidence IUPAT presents to challenge Reid's employment from 1965–68 comes from Reid's deposition, which was not before the Administrator; therefore, the Court may not consider it. *Wilkins*, 150 F.3d at 619 (instructing district courts to consider only evidence in the administrative record).

### 3. The union painting companies listed in the service record were not all contributing employers to the Local 1275 Plan when they employed Reid per Plan records.

IUPAT argues that Reid is not entitled to vesting credit for work performed for employers who did not contribute to the Local 1275 Plan during the period when the work was performed. IUPAT identifies no Plan records that show which union employers failed to contribute to either the Local 1275 Plan or the IUPAT Plan when Reid was an employee. The Administrator refers in conclusory fashion to "Local 1275 Plan and post-merger IUPAT Plan records with much lower credit," but does not provide those records to corroborate its claim that union painting companies failed to contribute to either Plan on Reid's behalf. IUPAT listed dozens of employers in the Service Record, but the Service Record only indicates whether companies were "painting contractor[s] by name" or "other employers with unknown work." (Doc. 40-1 at 30). The Service Record does not show which employers contributed to Local 1275 on Reid's behalf. If IUPAT has records showing which of Reid's employers contributed on his behalf when he worked for them, it should include that information along with the Service Record. The Administrator's reliance on the above-stated reason to deny Reid benefits is misplaced.

### 4. A hypothetical reduction in Reid's asserted years of service of 9/10 of a year would prevent Reid's pension from vesting.

Depending on IUPAT's choice of post-merger hours, this number may be correct. But IUPAT offers no number of its own, relying only on its arbitrary hypothetical reduction of 9/10 of a year to deny Reid a vested pension. Hypothetical reductions in years of service do not constitute the "principled reasoning process" required to survive review under the arbitrary and capricious standard. *Helfman*, 573 F.3d at 392.  If, on remand, IUPAT finds other support for reducing Reid's estimate by 0.9 years, it should state the grounds for that decision.

15

**5. No wage reconstruction can override the contemporaneous record of Reid's employment from the printout because that reconstruction cannot be adequately verified.**

IUPAT relies heavily on this argument in its brief. (Doc. 37-1 at 19). The "contemporaneous" record of Reid's employment is a barely legible printout with hand-written labels, ostensibly from Local 1275. It purports to show that in 1978, Reid had accumulated 5.6 years of service with Local 1275. (Doc. 40-1 at 68).

Reid does not dispute the authenticity of this document or its significance, but it gives the Court pause that the Administrator's benefits decision hinges on this document, which is not authenticated by any evidence in the record. The document appears throughout the Administrative Record, and the hand-written labels vary between iterations. For example, in Appendix I provided by Reid, the third through ninth columns have labels. (Doc. 40-1 at 68). In another iteration, the hand-written labels change: there are two additional labels, one from the first iteration is omitted, and the others are slightly altered. (Doc. 37-7 at 19). A third iteration has no labels at all. (Doc. 37-7 at 30).

Furthermore, this argument from IUPAT is disingenuous because IUPAT itself produced Reid's Service Record and wage reconstruction in an attempt to verify the contents of the Local 1275 printout. (*Id.* at 69–71). IUPAT did verify one of Reid's asserted wages. (Doc. 37-9 at 25). On remand, the Administrator should accept or refute Reid's Service Record and wage recollections and state its grounds for doing so, and if the Administrator relies on the printout, he should provide evidence of its authenticity.

**6. IUPAT's wage reconstruction that shows 5.3 years of pre-merger service is reliable corroborating evidence of the printout.**

IUPAT's wage reconstruction is based upon one known wage and simulates an arbitrary 3% wage increase per year. IUPAT's wage reconstruction is based on no known wage rates

before the merger. Reid asserted one pre-merger wage, and IUPAT verified that Reid's recollection was exactly correct: Reid made $9.99 per hour in 1977 working for Youngs Industrial & Commercial Painting Company. (*Id.* at 64). IUPAT's wage reconstruction is inherently flawed and partially contradicted by both Reid's affidavit and IUPAT's own records, yet IUPAT continues to rely on it. When an administrator cherry-picks evidence and relies on a report that is inherently unreliable in the face of countervailing evidence, its decision is arbitrary and capricious. *See Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 361–62 (6th Cir. 2002). Such is the case here.

At bottom, IUPAT's decision is arbitrary and capricious because it relies on a lone printout—one that has mutated throughout the record. Furthermore, IUPAT provides no persuasive response to Reid's analysis of his Social Security earnings reports even though it verified the only one of his asserted wages it could.

IUPAT cites five cases for the proposition that "It is not arbitrary or capricious to rely on contemporaneous records and reject the contrary 20/20 hindsight of belated employee claims." (Doc. 37-1 at 19). Each is inapposite; none control the Court's decision. In two of the cases, as is the case here, plaintiffs presented Social Security earnings reports with their own wage history reconstruction. In these cases, the administrator did not credit the claimants' wage reconstructions because they were contradicted by multiple reliable records that were produced contemporaneous with the relevant employment. *See Lewis v. Cent. States, Se. & Sw. Areas Pension Fund*, No. 1:09-CV-569, 2010 WL 3603206, at *15 (S.D. Ohio June 24, 2010), *report and recommendation adopted sub nom.* Lewis *v. Cent. States Se. & Sw. Areas Pension Fund*, No. 1:09CV569, 2010 WL 3605204 (S.D. Ohio Sept. 10, 2010); *Bush v. Am. Ben. Corp.*, No. CIV.A. 3:08-1422, 2010 WL 1404324, at *3 (S.D. W. Va. Mar. 30, 2010). Here, the Administrator

17

rejected Reid's wage reconstruction in favor of one record, the hand-written labels on which have changed throughout the administrative record.

In two other cases, the Social Security records actually contradicted the plaintiffs' claims and supported the Administrator's decision. *See Huff v. United Mine Workers of Am., Health & Ret. Funds*, 797 F. Supp. 521, 525–26 (S.D.W. Va. 1992); *Bessee v. San Francisco Culinary, Bartenders & Serv. Emps. Pension Fund*, No. C-91-1320-JPV, 1993 WL 219306, at *2–3 (N.D. Cal. June 1, 1993). Here, Reid's wage reconstruction is supported by his affidavit and is in part confirmed by IUPAT records.

IUPAT also cites *Becker v. Weinberg Grp., Inc. Pension Trust*, 473 F. Supp. 2d 48, 64 (D.D.C. 2007) to support its proposition. In *Becker*, contemporaneous documents were used to prove the correct interpretation of plan language; those documents were not relied on to prove specific contested facts. *Becker* does not support IUPAT's proposition.

On remand, IUPAT should consider all evidence concerning prevailing wage rates at the relevant times. IUPAT may not simply reject Reid's recollection of his wage rates, but it may find otherwise if another wage rate is supported by countervailing evidence. Evidence of wage rates may include wage records from similar contemporaneous work, a reasoned basis for interpolating between known wage rates, wage rates for similar work in other unions' records, or other evidence.

**B.    Equitable Estoppel**

Reid seeks to estop IUPAT from denying him additional pension benefits by operation of the Meyers Promise. IUPAT moves for summary judgment on Reid's equitable-estoppel claim, arguing that it is time barred by 29 U.S.C. § 1333 (statute of limitations), that the claim is actually one for breach of fiduciary duty, and that former IUPAT Administrator, Richard

Meyers, is the only proper party to the claim. (Def.'s Motion for Sum. J., doc 37-1 at 16–19). The Court does not address these arguments as Reid's equitable-estoppel claim is foreclosed for other reasons.

> An equitable-estoppel claim under ERISA requires:
>
> (1)[T]here must be conduct or language amounting to a representation of material fact; (2) the party to be estopped must be aware of the true facts; (3) the party to be estopped must intend that the representation be acted on, or the party asserting the estoppel must reasonably believe that the party to be estopped so intends; (4) the party asserting the estoppel must be unaware of the true facts; and (5) the party asserting the estoppel must reasonably or justifiably rely on the representation to his detriment.

*Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 456 (6th Cir. 2003) (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 403 (6th Cir. 1998) (en banc)). Generally, "estoppel 'cannot be applied to vary the terms of the unambiguous plan documents.'" *Bloemker v. Laborers' Local 265 Pension Fund*, 605 F.3d 436, 444 (6th Cir. 2010) (quoting *Sprague v. General Motors Co.*, 133 F.3d 388 (6th Cir. 1998) (en banc)). However, under *Bloemker*, a claim of estoppel may be asserted in the face of unambiguous plan documents if three additional requirements are met: "(1) a written representation; (2) plan provisions which, although unambiguous, did not allow for individual calculation of benefits; and (3) extraordinary circumstances in which the balance of equities strongly favors the application of estoppel." *Id.*

Here, the Plan documents are unambiguous and Reid has failed to produce evidence sufficient to show the existence of a genuine dispute of fact in regard to the first requirement: the existence of a written representation. The Meyers Promise was never reduced to writing. (Doc. 40 at 4, 19). Reid and his fellow affiants assert that Meyers promised Local 1275 participants a full year's pension-vesting credit for every year they were members of Local 1275 if they agreed

to the merger with IUPAT. (*Id.* at 20, 34–35, 52–53). No language in the Local 1275 Plan, the Merger Agreement, or the IUPAT Plan states this promise.

The nearest equivalent to a written representation of the Meyers Promise is Section 4.02(f)(3) of the IUPAT Plan. Section 4.02(f)(3) describes union membership as one of the ways that the Board could determine years of service prior to the merger. (Doc. 40-2, at 49). But, importantly, union membership is simply one of the three types of evidence that the Board could "in its absolute discretion, consider and rely upon" in determining years of service. (*Id.*). This provision is distinct from the Meyers Promise: that Local 1275 members would receive one year of vesting credit for every year of union membership. Therefore, the first *Bloemker* requirement of a written representation is not met.

Reid also argues that IUPAT incorporated the Meyers Promise into its administration of the merger, (Doc. 40 at 4), and that it was an enforceable part of the plan because ERISA plans need not be written. *See Adams v. Avondale Indus., Inc.*, 905 F.2d 943, 945 (6th Cir. 1990). In *Adams*, the parties agreed that an unwritten but detailed plan existed, and they stipulated the terms of the plan in the record. *Id.* at 945–46. *Adams* is distinguishable from this case because here there is specific, unambiguous, written plan language that Reid suggests was modified by a contemporaneous oral promise. The parties dispute the content and existence of the unwritten Meyers Promise. Reid's argument that IUPAT incorporated the Meyers Promise into its administration of the merger is not well taken.

**IV.  Conclusion**

Therefore, the Court GRANTS IUPAT's Motion for Summary Judgment on Reid's equitable-estoppel claim and DENIES IUPAT's Motion for Summary Judgment on Reid's

denial-of-benefits claim. (Doc. 37). The Court DENIES Reid's Motion for Judgment as a Matter of Law, (Doc. 40), and REMANDS the matter to the Administrator for findings consistent with this opinion.

      IT IS SO ORDERED.

s/ James L. Graham

JAMES L. GRAHAM

United States District Judge

DATE: November 24, 2015