# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

FRED MICHAEL REID,

        Plaintiff,

v.

INTERNATIONAL PAINTERS AND
ALLIED TRADES INDUSTRY
PENSION PLAN,

        Defendant.

Case No. 2:12-cv-00072

Judge Graham

Magistrate Judge Deavers

## OPINION AND ORDER

Plaintiff, Fred Michael Reid, brings this action under 29 U.S.C. § 1132(a)(1)(B), as authorized by the Employee Retirement Income Security Act of 1974 ("ERISA"), to recover pension benefits allegedly due to him by Defendant International Painters and Allied Trades Industry Pension Plan ("IUPAT"). This matter is now before the Court on Plaintiff's Second Motion for Judgment on the Administrative Record (Pl.'s Second Mot. J. Admin. R., ECF No. 57) and Defendant's Renewed Motion for Summary Judgment (Def.'s Renewed Mot. Summ. J., ECF No. 62). For the reasons set forth below, the Court **GRANTS** Plaintiff's Second Motion for Judgment on the Administrative Record and **DENIES** Defendant's Renewed Motion for Summary Judgment.

## I.    Background

### A.    Factual Background

Mr. Reid began working as a painter in 1965 and worked for various union painting companies within the jurisdiction of Painters Local Union No. 1275 ("Local 1275"). (Compl. ¶ 5, ECF No. 1 at 2; 2018 Suppl. Admin. R. 379, Reid Aff. ¶ 8, ECF No. 55 at 1700). Mr. Reid was

also a participant in the Painters Local No. 1275 Pension Fund ("Local 1275 Plan"). (Compl. ¶ 6, ECF No. 1 at 2). According to Mr. Reid, he was employed as a Local 1275 painter immediately prior to his 1966–1967 military service and within ten days following his discharge. (2018 Suppl. Admin. R. 379, Reid Aff. ¶¶ 10–12, ECF No. 55 at 1700). Mr. Reid returned to painting within the jurisdiction of Local 1275 in February 1968. (2013 Admin. R. 189, Reid Aff. ¶¶ 6–7, ECF No. 37-8 at 346). Except for non-union work with Craig Brothers Painting in 1972–1973 (2018 Suppl. Admin. R. 381, 383, Reid Aff. ¶¶ 25, 40, ECF No. 55 at 1702, 1704), Mr. Reid asserts that he continued painting for multiple Local 1275 painting companies through 1979. (2013 Admin. R. 194, 220 Reid Aff. ¶ 38, Pl.'s Ex. H, ECF No. 37-8 at 351 and ECF No. 37-9 at 377). On October 1, 1979, the Local 1275 Plan merged into the IUPAT Plan. (2018 Suppl. Admin. R. 273, ECF No. 55 at 1394). At the time of the merger, Mr. Reid had more than three years of service under the Local 1275 Plan and could vest under either the IUPAT Plan or the Local 1275 Plan rules, depending on which plan was more favorable. (2013 Admin. R. at 221, ECF No. 37-9 at 378). Following the merger, Mr. Reid continued working as a union painter until 1982. (2013 Admin, R. at 217, Pl.'s Ex. F, ECF No. 37-9 at 374). In 1982, Mr. Reid left painting to pursue a career in truck driving and did not return to painting within the jurisdiction of Local 1275 until 1999. (2013 Admin. R. 191, Reid Aff. ¶ 22, ECF No. 37-8 at 348).

Both parties submit that the Local 1275 Plan contains the more favorable terms and is the plan at issue for the time period claimed. (Def.'s Mem. Supp. Summ. J. 4, ECF No. 62-1 at 1802). Under the terms of the Local 1275 Plan, a participant loses previously credited service if the participant suffers a permanent break in service. (2013 Admin. R. 1008–09, ECF No. 37-10 at 393–94). But, if a participant completes ten or more years of credited vested service prior to an extended absence, then the participant becomes a Vested Participant (as defined in the Local 1275

Plan) and retains any previously accrued service credit upon return. (*Id.* at 1008, 393). According to the Local 1275 Plan, a Credited Vesting Service Year equaled 1,000 or more Vesting Hours (as defined in the Local 1275 Plan) in a calendar year, but partial credit of one-tenth of a year could be earned for each 100 full Vesting Hours in years with less than 1,000 Vesting Hours. (*Id.* at 1004, 389).

Therefore, under the terms of the Local 1275 Plan, if Mr. Reid completed at least ten years of credited vested service and became a Vested Participant prior to his 1982 departure, then he would have retained any pension credits previously earned upon his return to union painting in 1999. According to Mr. Reid's calculations, his combined 1965–1982 service surpassed the ten-year mark, and he should have been considered a Vested Participant upon his departure. Mr. Reid first inquired as to his total benefits hours in 2005 (2013 Admin. R. 18, 22, ECF No. 37-6 at 175, 179) and submitted his pension benefit application in 2008. (2013 Admin. R. 28, ECF No. 37-6 at 185). Over the course of several years and numerous inquiries, IUPAT has communicated to Mr. Reid that he was not vested upon his departure from union painting in 1982 and suffered a permanent break in service and cancellation of any previously credited hours of service. (*See, e.g.,* 2013 Admin. R. 155, ECF No. 37-8 at 312).

## B. Procedural Background

This case has been before this Court numerous times. On January 23, 2012, Mr. Reid filed this action against IUPAT. (Compl., ECF No. 1). On October 25, 2012, the Court remanded the case to the IUPAT plan administrator to allow Mr. Reid to first exhaust his administrative remedies. (Order, ECF No. 20). On March 28, 2013, the IUPAT Board of Trustees (the "Trustees") denied Mr. Reid's appeal of the pension fund's September 14, 2012 denial of his pre-merger pension benefits. (2013 Admin. R. 224, ECF No. 37-9 at 381). In its 2013 denial letter, the Board

of Trustees explained, "that [Mr. Reid] was not due credit for benefits for work before 1999, the year he returned to the IUPAT Plan." (*Id.* at 225, ECF No. 37-9 at 382). Though the pension fund office did not "have detailed records of the pre-merger Local 1275 Plan employers or annual hours," and Mr. Reid submitted a detailed earnings report from the Social Security Administration, his own affidavit, and those of former co-workers to support his claim, the Board of Trustees rejected Mr. Reid's calculations. (*Id.*). The Board of Trustees concluded that Mr. Reid had 5.6 years of credited service under the Local 1275 Plan and post-merger service of an additional 1.4 years, leaving him far from the required ten-year vesting mark when he left the merged plan in 1982. (*Id.* at 226, ECF No. 37-9 at 383).

Following receipt of IUPAT's denial letter, and upon Plaintiff's Motion to Reactivate the Case (ECF No. 21), the Court reopened Mr. Reid's case on September 23, 2013. On November 24, 2015, the Court found that the Board of Trustees acted arbitrarily and capriciously in denying Mr. Reid's 2013 claim. (Op. & Order 11–12, ECF No. 43 at 1460–61). The Court determined that the Trustees' decision was not supported by substantial evidence and was not the result of a deliberate and principled reasoning process. (*Id.* at 12, 1461). The Court remanded the case to IUPAT to address six issues: 1) provide evidence of Mr. Reid's pre-merger and post-merger service; 2) cite evidence showing that Mr. Reid's 1965 service should be divested; 3) include evidence of employer contributions on Mr. Reid's behalf, along with his service record; 4) include other support for reducing Mr. Reid's estimate by 0.9 years; 5) accept or refute Mr. Reid's service record and wage recollections, state grounds for doing so, and provide evidence of the Local 1275

printout's authenticity; and 6) consider all evidence concerning prevailing wage rates at the relevant times. (*Id.* at 13–16, 18, ECF No. 43 at 1462–65, 1467).

On April 20, 2016, IUPAT submitted a draft response to the Court's six questions to Mr. Reid concluding, "The Fund accepts Reid's reconstruction of pre-merger hours, but this does not give him the additional credit he seeks because many of the hours were not work with contributions to the Local 1275 Plan." (2018 Suppl. Admin. R. 273, ECF No. 55 at 1594). Defendant IUPAT further stated, "There are limited or no remaining records of actual hours before the merger. The Plan cannot make a specific determination of the number of contributory hours worked under the Local 1275 Plan for each year before the merger." (*Id.*). Defendant IUPAT asserted that Mr. Reid "mistakenly claims credit for work outside the area of the Local 1275 Plan with no apparent contributions to the Local 1275 Plan." (*Id.*).

On January 22, 2018, Mr. Reid responded to IUPAT's assertions by submitting two additional affidavits and Internet printouts showing that his claimed employers were based in the Columbus area. (*Id.* at 375–95, 1696–1716). The two affidavits establish he was never a member of any union other than Local 1275. (2018 Suppl. Admin. R. 379–80, Reid Aff. ¶¶ 9, 21, ECF No. 55 at 1700–01; *Id.* at 387, Hiles Aff. ¶ 3, 1708). Mr. Reid's second affidavit also addresses each year for which he claims credit and explains why, under the general rules in effect at that time, the work he performed fell within the jurisdiction of Local 1275. (*Id.* at 377, 1698).

On March 16, 2018, IUPAT affirmed its denial of benefits to Mr. Reid. (*Id.* at 396, 1717). In its final determination letter, the Board of Trustees revealed its discovery of a Local 1275 work history card (*Id.* at 352, 1673) purportedly reflecting Mr. Reid's service by quarter from 1974 to 1979. (*Id.* at 399, 1720). According to IUPAT, the total hours on the work history card match the 1978 hours shown on the computer printout (2013 Admin. R. 94, ECF No. 37-7 at 251) it

previously relied on in its 2013 decision. (2018 Suppl. Admin. R. 399, ECF No. 55 at 1720). A revised service record for Mr. Reid was prepared using these documents and a newly recovered letter (*Id.* at 282, 1603) summarizing Local 1275 journeyman wage rates for the years at issue. (*Id.* at 399, 1720). Per IUPAT's calculations, these documents provide Mr. Reid with 6.6 years of pre-merger service. (Def.'s Mem. Supp. Summ. J. 8, ECF No. 62-1 at 1806). Using merged plan records, IUPAT determined Mr. Reid was entitled to 1.1 years of post-merger vesting service credit under the Local 1275 Plan rules, giving him a total of 7.7 years of credited service. (*Id.* at 6, 1804).

This differs substantially from Mr. Reid's estimated total of 10.7 years,[1] leaving 3 years of disputed service credit. (Pl.'s Second Mot. J. Admin. R. 17 at n.1, ECF No. 57 at 1771). Crucial to this dispute are Mr. Reid's 2.5 years of claimed service credit between 1965–1970. (Pl.'s Mem. Opp'n Summ. J. 7, ECF No. 65 at 1865). In contrast, IUPAT gave Mr. Reid zero credit for his 1965–1970 service due to his alleged failure to provide proof of employer contributions to the Local 1275 Plan during that period. (2018 Suppl. Admin. R. 273, ECF No. 55 at 1594). Mr. Reid argues that IUPAT's demand is contrary to the terms of the Local 1275 Plan, as he submitted proof that he met the plan's vesting requirements prior to 1983 and is entitled to a vested pension under its terms. (*Id.* at 4, 21, 1758, 1775). As IUPAT's 2018 denial letter states, "The ultimate question . . . hinges on whether there is any proof that contributions were paid to the Local 1275 plan for Reid's work before 1971 (or 1973)." (2018 Suppl. Admin. R. 401, ECF No. 55 at 1722). The

---

[1] In his Second Motion for Judgment on the Administrative Record, Mr. Reid put forth an estimated total of 10.9 years, but conceded to a reduction of 0.2 years during the parties' December 6, 2018, oral argument. (Oral Arg. Tr. 52:17–18).

Court agrees with the Board of Trustees' statement and will focus its review of the Trustees' decision on this critical period of pre-merger service.

## II. Standard of Review

### A. Jurisdiction

#### 1. ERISA

Although not explicitly raised by the parties, there is a jurisdictional issue that prompts the Court's initial discussion of the applicable standard of review in this case. *See United States v. United Mine Workers of Am.,* 330 U.S. 258, 291 (1947) (establishing that a federal court has the authority to determine its own jurisdiction in a case). As summarized earlier, Mr. Reid's employment history spans from 1965–1982, and he brings his claim against IUPAT under the provisions of ERISA for his right to credited service for the entirety of this period. (Compl. ¶ 25, ECF No. 1 at 4). While 29 U.S.C. § 1132 provides plan participants with the right to sue the plan and creates federal jurisdiction over ERISA proceedings, it does not expound on the extent of ERISA jurisdiction over claims for pre-enactment benefits. *Stevens v. Employer-Teamsters Joint Council No. 84 Pension Fund,* 979 F.2d 444, 450 (6th Cir. 1992) (addressing the scope of ERISA jurisdiction). Instead, the section of the statute addressing ERISA preemption, 29 U.S.C. § 1144, states, "This section shall not apply with respect to any cause of action which arose, or any act or omission which occurred, before January 1, 1975." 29 U.S.C. § 1144(b)(1). Even though Mr. Reid's claim for benefits was denied decades after 1975, the Sixth Circuit has determined that there is no ERISA jurisdiction when the decision of whether to grant plan benefits is influenced

by pre–1975 events.  *Stevens,* 979 F.2d at 452–53 (finding that "ERISA jurisdiction does not lie if a pension plan's denial of benefits was based on pre–1975 acts or omissions.").

As outlined in the Board of Trustees' March 16, 2018, denial letter, IUPAT's decision to deny Mr. Reid's request for benefits centered on the ultimate question of whether there is proof of Local 1275 contributions for Mr. Reid's service prior to either 1971 or 1973. (2018 Suppl. Admin. R. 401, ECF No. 55 at 1722).  Thus, the Trustees' decision was based on either the act or omission of payment contributions prior to 1971 or 1973. (*Id.*).  As those years occur prior to ERISA's preemption effective date of January 1, 1975, the 1965–1974 portion of Mr. Reid's claim falls outside the scope of ERISA's jurisdiction.

### 2. LMRA

Since the pre–1975 portion of Mr. Reid's claim for benefits is not governed by ERISA, the Court should consider whether jurisdiction for that period instead lies under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). *See Stevens,* 979 F.2d at 454 (noting "that in the case where a pension plan participant seeks to sue the plan and jurisdiction does not lie under ERISA, the participant is not left bereft of all remedies").  Courts have considered ERISA as largely displacing § 301 of the LMRA in certain pension plan contexts. *Id.* at n.4 (citing *Reiherzer v. Shannon,* 581 F.2d, 1266, 1271 (7th Cir. 1978)).  Based on the Supreme Court's holding in *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202 (1985), the Sixth Circuit has recognized that § 301 extends to suits involving pension plans. *Stevens,* 979 F.2d at 456.  Moreover, the Sixth Circuit has held that under § 301, plan participants "in a collectively-bargained pension plan may [still] maintain an action against the plan trustees." *Id.* at 455–57 (agreeing with the Ninth's Circuit's decision in *Rehmar v. Smith,* 555 F.2d 1362, 1366 (9th Cir. 1976) concerning a court's jurisdiction " . . . as long as the suit is for violation of a contract between a union and employer

even if neither party is a union or an employer.").  Therefore, this Court invokes jurisdiction over the pre–1975 portion of Mr. Reid's claim for benefits against IUPAT under § 301 of the LMRA, 29 U.S.C. § 185(a).

### 3.   Review of the Board of Trustees' Decision under ERISA/LMRA

Whether before the Court under the jurisdiction of ERISA or the LMRA, this Court's review of the Board of Trustees' 2018 decision to affirm Mr. Reid's denial of benefits is limited to the arbitrary and capricious standard of review.  *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109–10, 115 (1989); *Stevens,* 979 F.2d at 458; *Varhola v. Doe,* 820 F.2d 809, 813 (6th Cir. 1987).  Under the LMRA, courts have consistently recognized that the "appropriate standard of review governing decisions of pension funds to deny benefits is limited to determining whether the trustees' actions were arbitrary and capricious." *Stevens,* 979 F.2d at 458.  Likewise, under ERISA "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 489 U.S. at 115. The pension plan at issue in this case plainly gives the Trustees "the exclusive right and discretionary authority to construe the terms of the Plan," thus making the arbitrary and capricious standard the appropriate standard of review of the ERISA portion of Mr. Reid's claim. (ECF No. 37-21 at 65–66; *see also* Pl.'s Resp. in Opp'n 3, ECF No. 42). As the same standard of review

applies under both the LMRA and ERISA, this Court will review the entirety of Mr. Reid's claim

for benefits from 1965–1982 under the arbitrary and capricious standard of review.

## B. The Administrative Record

### 1. Supplemental Declarations

Not only is the Court's review of the Board of Trustees' decision limited to the arbitrary

and capricious standard, it is also confined to the contents of the administrative record as it existed

on the date the Trustees reached that decision. *Moon v. Unum Provident Corp.,* 405 F.3d 373, 378

(6th Cir. 2005); *Univ. Hosps. of Cleveland v. Emerson Elec. Co.,* 202 F.3d 839, 845 n.2 (6th Cir.

2000) (considering "only the materials available to the [committee], and not any depositions,

affidavits, or similar litigation-related materials that the parties submitted to the District Court");

*Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 619 (6th Cir. 1998). In its December 6,

2018, hearing on Plaintiff's Motion to Strike Extra-Record Documents, the Court concluded that

"well-established case law dictates that the Court's review of the underlying motions for judgment

in this case is confined to the administrative record as it existed on the date of the administrator's

upholding of the denial of Mr. Reid's benefits." (Oral Arg. Tr. 4:1–5). This ruling precluded from

the Court's consideration two supplemental declarations that were not submitted to the Board of

Trustees and not filed with this Court as part of the administrative record. (*Id.* at 5:12–15).

Even though the two declarations are stricken from the Court's consideration, the Court

will nonetheless consider the documents attached to the declarations, as those documents are

undisputedly already a part of the administrative record. (*Id.* at 5:21–25). Attached to the first

declaration is a Local 1275 Plan work history card for Mr. Reid that was considered by the IUPAT

Board of Trustees during its 2018 evaluation of Mr. Reid's claim and filed with this Court as part

of the supplemental administrative record on May 31, 2018. (2018 Suppl. Admin. R. 104–06, ECF

No. 55 at 1673–75). The second declaration includes plan service records of Mr. Reid that were part of the administrative record considered in Mr. Reid's 2013 appeal. (2013 Admin. R. 94, 105, 126, 147, 160, 162–75, ECF No. 37-7 at 251, 262, 283, 304 and ECF No. 37-8 at 317, 319–32).

### 2. Mr. Reid's Deposition

A further limitation to the Court's review is its inability to consider a document frequently referred to by IUPAT, yet not included in the administrative record: Mr. Reid's deposition. Mr. Reid was deposed on January 21, 2014, well after the Trustees' March 28, 2013 consideration of the original administrative record. (Notice, ECF No. 38 at 1038). Thus, Mr. Reid's deposition was not a part of the administrative record as it existed on the date of the Board of Trustees' 2013 denial of benefits decision. Though IUPAT attached several pages of Mr. Reid's deposition in its May 6, 2014 Motion for Summary Judgment (ECF No. 37), this action does not make it part of the 2013 administrative record. In its 2015 Opinion and Order in this case, the Court made it clear that it could not consider Mr. Reid's deposition in its analysis. (Op. & Order 14 n.4, ECF No. 43 at 1463) (stating that "most of the evidence IUPAT presents to challenge Reid's employment from 1965–68 comes from Reid's deposition, which was not before the Administrator; therefore, the Court may not consider it."). Even though IUPAT referenced the deposition in its April 20, 2016, draft determination memorandum to Mr. Reid, it never provided any corresponding citations to the deposition as being contained in the administrative record, as it did with other documents incorporated into its analysis. For example, within the same paragraph, Mr. Hiles's affidavit is referenced as "Hiles Affidavit, ¶ 8, Rec. D0197," whereas Mr. Reid's deposition is only referenced as "Reid Depos. pp.67-68." (2018 Suppl. Admin. R. 274, ECF No. 55 at 1595). As noted in the 2016 draft determination memorandum, which was incorporated into the 2018 denial letter, "The administrative record before the Plan . . . is reference [sic] as "Rec." with the page number in the

format 'D____'.  Other citations are to the record in this court." (*Id.* at 273 n.1, ECF No. 55 at 1594).  Consistent with this methodology, IUPAT did not file the deposition with the Court on May 31, 2018, as part of the supplemental administrative record.  (ECF No. 55).  Therefore, this Court may not consider Mr. Reid's deposition in its evaluation of the Board of Trustees' decision, as it is not part of either the 2013 administrative record or the 2018 supplemental administrative record considered by the Board of Trustees.[2] *Wilkins,* 150 F.3d at 619 (instructing district courts to consider only evidence in the administrative record).

### C.  Judgment on the Administrative Record

As this Court may only consider evidence contained in the administrative record, summary judgment is not "the proper procedural vehicle for disposing of" Mr. Reid's denial of benefits claim. (Op. & Order 10, ECF No. 43 at 1459).  Furthermore, as the Sixth Circuit explained in *Wilkins v. Baptist Healthcare System, Inc.,* "traditional summary-judgment concepts generally play no role in the adjudication of an . . . action for benefits . . . because the district court is limited to the evidence before the plan administrator at the time of its decision (i.e., the administrative record)." 150 F.3d at 617–19 (Gilman, J., concurring). Thus, just as the Court did previously in its 2015 evaluation of the Board of Trustees' decision, the Court will adjudicate IUPAT's "Renewed Motion for Summary Judgment" as a Renewed Motion for Judgment on the Administrative Record. (Op. & Order 7, ECF No. 43 at 1456).  In doing so, the Court will evaluate the parties' cross motions for judgment on the administrative record to determine whether the Board of Trustees' decision was arbitrary and capricious.

---

[2] Even if Mr. Reid's deposition had been properly included as part of the administrative record, it would not change the Court's analysis, as it does not support the conclusion reached by the Board of Trustees.  As noted by the Court during the parties' December 6, 2018, oral argument, "I don't see any discrepancy at all between his deposition testimony and his affidavit." (Oral Arg. Tr. 35:23–24).

### D. Arbitrary and Capricious Standard

In evaluating an administrator's decision under the arbitrary and capricious standard, the decision will be upheld "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Helfman v. GE Grp. Life Assur. Co.*, 573 F.3d 383, 392 (6th Cir. 2009) (quoting *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 552 (6th Cir. 2008)) (internal quotation marks omitted). Substantial evidence means that "the plan administrator's decision was rational in light of the plan's provisions." *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997); *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003). Such a decision "will not be deemed arbitrary and capricious so long as it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome." *Price v. Bd. of Trs. of Indiana Laborer's Pension Fund*, 707 F.3d 647, 651 (6th Cir. 2013) (quoting *Haus v. Bechtel Jacobs Co., LLC*, 491 F.3d 557, 561–62 (6th Cir. 2007)) (internal quotation marks omitted).

Though the arbitrary and capricious standard "is not a 'demanding form of judicial review,'" *Okuno v. Reliance Standard Life Ins. Co.,* 836 F.3d 600, 607 (6th Cir. 2016) (quoting *Schwalm v. Guardian Life Ins. Co. of Am.,* 626 F.3d 299, 308 (6th Cir. 2010), it is also not a "rubber stamp" of the administrator's decision. *Id.* (citing *McDonald,* 347 F.3d at 172–73). Where the administrative record contains an absence of reasoning, a denial of benefits will not be upheld. *Id.* An administrator's decision is arbitrary and capricious when reached "upon a selective review of the administrative record." *Evans v. Unumprovident Corp.,* 434 F.3d 866, 878 (6th Cir. 2006) (citing *Moon v. Unum Provident Corp.,* 405 F.3d 373, 381 (6th Cir. 2005)); *see also Spangler v. Lockheed Martin Energy Sys., Inc.,* 313 F.3d 356, 362 (6th Cir. 2002) (determining that cherry-picking a claimant's file to obtain a favorable outcome for the plan is arbitrary and capricious). When reviewing a claim for benefits, "plan administrators . . . may not arbitrarily refuse to credit

a claimant's reliable evidence . . . ." *Evans,* 434 F.3d at 877 (quoting *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834 (2003)) (internal quotation marks omitted). A plan administrator cannot simultaneously ignore countervailing evidence and offer a reasoned explanation supported by substantial evidence. *See Spangler,* 313 F.3d at 361–62.

## III. Discussion

Mr. Reid once again bears the burden of proving his entitlement to benefits. On remand, the Court asked IUPAT to address six issues in its subsequent review of Mr. Reid's claim. (*Id.* at 13–16, 18, ECF No. 43 at 1462–65, 1467). The parties' responses and the additional evidence provided by each narrows the scope of the Court's review to the Board of Trustees' determination of Mr. Reid's pre-merger service credit.[3] Defendant IUPAT concedes that Mr. Reid has sustained his burden of proof regarding 7.7 years of service credit, leaving a 2.3-year deficit for which Mr. Reid must prove his service entitlement to reach the required ten-year mark for vesting. (Def.'s Mem. Supp. Summ. J. 6, ECF No. 62-1 at 1804). While the Board of Trustees has accepted the accuracy of Mr. Reid's pre-merger wage rates and the hours claimed, it maintains that the remaining records do not indicate that pension contributions were paid to the Local 1275 Plan on Mr. Reid's behalf, and that proof of contributions is required for Mr. Reid to obtain vesting credit. (2018 Suppl. Admin. R. 280, ECF No. 55 at 1601).

The remaining pre-merger years at issue are summarized below:

---

[3] Mr. Reid has now accepted all of IUPAT's post-merger service calculations (Oral Arg. Tr. 52:17–18).

| Year | Employers | Hours Claimed | Hours Credited | Credit Claimed | Credit Given | Discrepancy |
|------|-----------|---------------|----------------|----------------|--------------|-------------|
| 1965 | Martin Painting<br>Harold F Mollenauer<br>General Maintenance & Engineering | 457 | 0 | 0.4 | 0 | 0.4 |
| 1968 | Bohl Painting<br>Martin Painting | 1,152 | 0 | 1.0 | 0 | 1.0 |
| 1969 | Martin Painting | 357 | 0 | 0.3 | 0 | 0.3 |
| 1970 | Martin Painting<br>HT Andrews | 828 | 0 | 0.8 | 0 | 0.8 |
| 1971 | Martin Painting | 310 | 239.46 | 0.3 | 0.2 | 0.1 |
| 1973 | Martin Painting<br>Robinson Assoc<br>Werner Maintenance | 1,106 | 850.4 | 1.0 | 0.8 | 0.2 |
| 1977 | Youngs Industrial<br>Ralph Rhoden | 895 | 628 | 0.8 | 0.6 | 0.2 |

## A. Pre-merger Service Credit

On remand, the Board of Trustees determined that Mr. Reid accrued 6.6 years of pre-merger service credit. (2018 Suppl. Admin. R. 399–400; ECF No. 55 at 1720–21). Notably, Mr. Reid did not receive any service credit for the work he performed during 1965–1970. (*Id.* at 400–01, 1721–22). While IUPAT acknowledges that no pre-1974 plan records exist,[4] it also emphasizes that for Mr. Reid to receive service credit for the 1965–1970 period, he must prove that each of his employers was required to pay contributions for the areas he worked in. (*Id.* at 400, 1721). To satisfy this burden, Mr. Reid supplemented the detailed 1965–1982 Social Security

---

[4] The 1974–78 work history card is the oldest Local 1275 Plan record contained in the administrative record. Prior to this discovery, IUPAT stated, "There are limited or no remaining records of actual hours before the merger. The Plan cannot make a specific determination of the number of contributory hours worked under the Local 1275 Plan for each year before the merger." (2018 Suppl. Admin. R. 273, ECF No. 55 at 1594). Other than the subsequent discovery of the work history card, IUPAT admits, "[T]here are no records." (Oral Arg. Tr. 26:25). There is nothing to account for Mr. Reid's earlier work history. (*Id.* at 27:1–8). While Local 1275 pension fund records existed at the time of the 1979 merger, IUPAT cannot account for what happened to those records. (*Id.* at 16:12–20).

Administration earnings report and affidavits already contained in the administrative record with two additional affidavits addressing his pre-merger service and Internet printouts showing that his claimed employers were based in the Columbus area. (*Id.* at 375–95, 1696–1716). After reviewing Mr. Reid's submissions, the Board of Trustees refused to credit Mr. Reid's testimony or the corroborating evidence he offered, and instead insisted that Mr. Reid's memory is unsupported by contemporaneous records. (2018 Suppl. Admin. R. 401, ECF No. 55 at 1722).

What the Trustees put forth as "contemporaneous" records of Mr. Reid's pre-merger service are a barely legible printout allegedly summarizing his service credit as of 1978 and an illegible 1974–1978 work history card. (2013 Admin. R. 94, ECF No. 37-7 at 251; 2018 Suppl. Admin. R., Ex. 9, 352–54, ECF No. 55 at 1673–1675). The Trustees use fragments of documents to piece together their theory that Mr. Reid's employers did not contribute to the Local 1275 Plan during the time he worked in various areas. (2018 Suppl. Admin. R. 401, ECF No. 55 at 1722). These documents bearing only limited portions of barely legible information do not cover the critical time period in question.

The inherent difficulty in evaluating the Trustees' decision is there are no contemporaneous Local 1275 records prior to 1974. The Trustees therefore resort to relying on the absence of documents to deny Mr. Reid's claim, stating there is no proof that the pension contributions required for Mr. Reid to vest were made. For the Trustees' decision to be upheld, the decision must be the "result of a deliberate, principled reasoning process . . . supported by substantial evidence." *Helfman*, 573 F.3d at 392. Here, the Trustees' substantial evidence is the absence thereof. As there are no records to establish the Trustees' basis for their denial of Mr. Reid's claim, the Trustees have failed to provide substantial evidence to support a deliberate principled reasoning process.

The Trustees further contend that the available records also do not indicate that pension contributions were paid to the Local 1275 Plan on Mr. Reid's behalf. (2018 Suppl. Admin. R. 280, ECF No. 55 at 1601). To support this assertion, the Trustees rely on the 1979 IUPAT/Local 1275 Master Collective Bargaining Agreement. (*Id.* at 309–19, Ex. 4, 1630–40). In anticipation of the October 1, 1979, merger, Local 1275 painting and decorating contractors entered into a Master Collective Bargaining Agreement with IUPAT. (*Id.*). The Trustees reason that if any of Mr. Reid's claimed employers were contributing members of Local 1275 during the pre-merger period, these employers would appear on the Master Collective Bargaining Agreement list with an effective date of 1979. (*Id.* at 272, 400, 1593, 1721). The Trustees aver that absent an effective date of 1979, Mr. Reid cannot provide proof of an employer's payment obligation to the Local 1275 Plan. (*Id.* at 277, 1598).

The Trustees use both sets of evidence selectively and apply certain standards inconsistently throughout their analysis of Mr. Reid's claim. For example, in their 2018 denial letter, the Trustees definitively state, "The total hours on the [work history] card for 1978 match the hours shown for 1978 on the computer printout of Reid's total service as of 1978." (*Id.* at 399, 1720). Yet in the last paragraph on the same page, the Trustees further state, "The Local 1275 computer printout shows 5.6 years of service by the end of 1978, which is one more year than the [work history] card shows to 1978. That service apparently was on an earlier (5-year) card that did not survive." (*Id.*). The Court draws two conclusions here. One, the work history card does not match the computer printout after all. Two, the Trustees are willing to overlook missing documents and provide credit in certain instances, but not in others.

The Court notes the same inconsistency in the application of the 1979 Master Collective Bargaining Agreement. The Trustees reject every one of Mr. Reid's claimed employers for the

1965–1970 period, but not for the same reasons. For example, two of the three employers Mr. Reid claims for 1965, Martin Painting and Harold F. Mollenauer, appear on the IUPAT/Local 1275 Master Collective Bargaining Agreement with a 1979 effective date. (Oral Arg. Tr. 11:7–11, 24:8–10). The Trustees previously reasoned that if any of Mr. Reid's claimed employers were contributing members of Local 1275 during the pre-merger period, these employers would appear on the Master Collective Bargaining Agreement list with an effective date of 1979. (2018 Suppl. Admin. R. 272, 400, ECF No. 55 at 1593, 1721). Nevertheless, upon deciding whether to award credit for 1965, the Trustees did not apply this standard to Martin Painting and Harold F. Mollenauer. Instead, they insisted that Mr. Reid performed "out of area" work, and despite working for verified Local 1275 employers on their agreed upon contribution list, he still could not receive credit for his work. (*Id.* at 274–76, 1595–97).

Not only did the Trustees ignore Martin Painting's presence on the 1979 pre-merger contribution list, but they ignored Mr. Reid's verified Local 1275 wage rate for his work with Martin Painting. (2013 Admin. R. 193, Reid Aff. ¶ 33, ECF No. 37-8 at 350; *Id.* at 176, 333; 2018 Suppl. Admin. R. 282, Ex. 1, ECF No. 55 at 1603). While the Trustees have "assumed the accuracy of Reid's pre-merger wage rates" (2018 Suppl. Admin. R. 280, ECF No. 55 at 1601), they dismiss this evidence when confronted with acknowledging these employers as Local 1275 employers.

Further problematic with the Trustees' inconsistent 1965 analysis is the lack of any evidence that Mr. Reid performed work for Harold F. Mollenauer outside of Local 1275's geographic jurisdiction. Thus, the Trustees' flat assertion that "Reid worked under Local 555, not Local 1275, from 1965 to 1968" falls short. (2018 Suppl. Admin. R. 274, ECF No. 55 at 1595). Moreover, IUPAT membership records demonstrate that Mr. Reid was a member of Local 1275 prior to 1968. (2013 Admin. R. 161, ECF No. 37-8 at 318).

There is also no evidence that Mr. Reid was working outside of Local 1275's jurisdiction when he was employed by General Maintenance & Engineering. (Oral Arg. Tr. 20:21–25). It is here, however, that the Trustees decided to apply the 1979 pre-merger effective date standard. (2018 Suppl. Admin. R. 272, 400, ECF No. 55 at 1593, 1721). The Trustees rejected Mr. Reid's claimed hours with General Maintenance & Engineering because the company shows a later effective date of 1988. (*Id.* at 277, n.5, ECF No. 55 at 1598, n.5).

During the parties' oral argument, IUPAT conceded that General Maintenance & Engineering could have "dropped out by '79," and the collective bargaining agreement does not account for an earlier membership history. (Oral Arg. Tr. 13:17–24). The 1979 collective bargaining agreement is also not a Local 1275 record showing whether any 1965 contributions were made on Mr. Reid's behalf, as those records did not survive the pre-merger period. (*Id.* at 26:8–9). The Trustees also ignore the fact that the 383 hours Mr. Reid claims with General Maintenance & Engineering (2013 Admin. R. 220, Pl.'s Ex. H, ECF No. 37-9 at 377) were verified by his earnings report (*Id.* at 176, ECF No. 37-8 at 33), his 2011 affidavit (*Id.* at 193, Reid Aff. ¶ 33, ECF No. 37-8 at 350), and most recently, the Local 1275 wage rate letter discovered during the Trustees' 2018 review (2018 Suppl. Admin. R. 282, Ex. 1, ECF No. 55 at 1603). Yet again the Trustees dismiss evidence indicating Local 1275 employment.

The Trustees offer no explanation as to why only the alleged evidence favorable to the denial of service credit warrants credence, and why the evidence favorable to the award of credit, is ignored. In the absence of any contemporaneous records to rebut Mr. Reid's proffered evidence and the "selective picking of evidence that the Sixth Circuit has described as 'not the hallmark of a reasoned explanation,'" *Myers v. Mut. of Omaha Life Ins. Co.*, 175 F. Supp. 3d 820, 828 (N.D. Ohio 2016) (citing *Metro. Life Ins. Co. v. Conger*, 474 F.3d 258, 266 (6th Cir. 2007)), this Court

cannot find that the Trustees engaged in a deliberate, principled reasoning process supported by substantial evidence.

### 1. 1965

Mr. Reid maintains he began painting within the jurisdiction of Local 1275 in 1965. (2018 Suppl. Admin. R. 379, Reid Aff. ¶ 8, ECF No. 55 at 1700). Affidavits from former co-workers Robert Hiles and Ernest Kimberling support this assertion. (2018 Suppl. Admin. R. 387, Hiles Aff. ¶ 3, ECF No. 55 at 1708; 2013 Admin R. 197, Kimberling Aff. ¶ 8, ECF No. 37-8 at 354). His claimed employers for that year are Martin Painting, Harold F. Mollenauer, and General Maintenance & Engineering. (2018 Suppl. Admin. R. 384, ECF No. 55 at 1705). His Social Security Administration earnings report shows he worked for all three during the fourth quarter of 1965. (2013 Admin. R. 176–77, ECF No. 37-8 at 333–34). Mr. Reid claims 0.4 years of credited service for 1965. (2018 Suppl. Admin. R. 384, Pl.'s Ex. A, ECF No. 55 at 1705).

The Board of Trustees relied on Mr. Reid's deposition, which is not a part of the administrative record, as evidence that Mr. Reid worked outside Local 1275's jurisdiction. (*Id.* at 274–76, 1595–97). According to the Trustees, this "out of area" work did not obligate his employers to pay contributions to the Local 1275 Plan, and consequently, did not entitle Mr. Reid to any service credit under the Local 1275 Plan. (*Id.*). The Trustees further assert that this determination is consistent with IUPAT union records showing Mr. Reid was not initiated into Local 1275 until March 1968. (*Id.* 274, 1595 citing 2013 Admin. R. 19, ECF No. 37-6 at 176).

Setting aside IUPAT's misplaced reliance on Mr. Reid's deposition, the Trustees further reason that the assumed lack of contributions is consistent with the alleged general lack of contributions paid for apprentices in the 1960s. (2018 Suppl. Admin. R. 401, ECF No. 55 at 1722). While the Trustees state this is a plausible explanation, the Trustees offer no evidence in the

administrative record to support it. (*Id.*). Without any supporting evidence, this explanation cannot provide a reasonable basis for the Trustees' decision to deny Mr. Reid's claim for service credit during the 1960s.

### a. Local 1275 Membership

The available evidence also does not support the conclusion that Mr. Reid was not a member of Local 1275 until 1968. While Mr. Reid's IUPAT member history indicates he was initiated on March 23, 1968, the line directly below that notation states that Mr. Reid had an old card number of #275477 prior to that date. (2013 Admin. R. 19, ECF No. 37-6 at 176). Mr. Reid's member history further shows that upon his March 23, 1968, initiation, he was given a new card number of #044500. (*Id.*). Mr. Reid was also "initiated" in 1999 when he returned to union painting from trucking. (*Id.*). Even though his member history reflects an earlier Local 1275 membership, he was once again "initiated" in 1999. (*Id.*). The Court notes that the same activity code of "1" and description indicating Mr. Reid was "initiated" were used in each instance that Mr. Reid returned from an extended absence. (*Id.*). Mr. Reid's first extended absence was due to military service, and his second extended absence was due to a career change. (2013 Admin. R. 189, 191 Reid Aff. ¶¶ 6, 22, ECF No. 37-8 at 346, 348).

The Court concludes that IUPAT membership records demonstrate that Mr. Reid was a member of Local 1275 prior to 1968. As these records corroborate Mr. Reid's affidavit testimony, the Court finds that the Trustees' determination that Mr. Reid lacked union membership prior to 1968 was not a reasoned deliberation supported by substantial evidence. The Trustees engaged in a selective review of the administrative record by ignoring countervailing evidence that overwhelmingly supports the contrary, that Mr. Reid became a Local 1275 member in 1965.

### b. Contributions and Reciprocal Credit

As a further hurdle to Mr. Reid's 1965 service claim, IUPAT declares that even if Mr. Reid was working for a Local 1275 employer listed on the 1979 collective bargaining agreement, he is still not entitled to credit for "out of area" work. (2018 Suppl. Admin. R. 274, ECF No. 55 at 1595). This argument targets Mr. Reid's 1965–1968 work with Martin Painting. (*Id.*). As before, most of the evidence IUPAT presents to challenge Mr. Reid's employment with Martin Painting comes from Mr. Reid's deposition, which was not included in the administrative record. (2018 Suppl. Admin. R. 274, ECF No. 55 at 1595). Therefore, the Court may not consider it. Even if the Trustees considered Mr. Reid's notation that his 1965 work for Martin Painting took place in northwest Ohio (*Id.* at 384, Pl.'s Ex. A, 1705), Mr. Reid maintains that, "all of the painting work I did was for union employers and was contracted through and paid at the wage and pension rates established by Local 1275." (*Id.* at 383, Reid Aff. ¶ 40, 1704).

Mr. Reid's 1965 earnings report, his earlier affidavit, and the Local 1275 wage rate letter support this assertion. (2013 Admin. R. 176, ECF No. 37-8 at 333; *Id.* at 193, Reid Aff. ¶ 32, 350; 2018 Suppl. Admin. R. 282, Ex. 1, ECF No. 55 at 1603). Mr. Reid's earnings report shows he made $240.90 while working for Martin Painting in 1965. (2013 Admin. R. 176, ECF No. 37-8 at 333). In his 2011 affidavit, he stated, "I likewise remember how much I was paid by Martin Painting in 1965 ($3.65 per hour) . . . ." (2013 Admin. R. 193, Reid Aff. ¶ 32, ECF No. 37-8 at 350). By taking his total earned wages and dividing them by $3.65, Mr. Reid claimed 66 hours with Martin Painting in his 2013 appeal. (*Id.* at ¶ 33). During the Trustees' 2018 review of Mr. Reid's claim, the newly discovered wage rate letter showing a Local 1275 1965 hourly wage rate of $3.65 confirmed Mr. Reid's earlier testimony. (2018 Suppl. Admin. R. 282, Ex. 1, ECF No. 55 at 1603).

Applying the same rationale to his other 1965 employers, Mr. Reid's earnings report shows he made $1,398.95 with General Maintenance & Engineering in 1965. (2013 Admin. R. 176, ECF No. 37-8 at 333). Dividing $1,398.95 by the Local 1275 1965 hourly wage rate of $3.65 produces the 383 hours Mr. Reid claims with General Maintenance and Engineering. (2013 Admin. R. 220, Pl.'s Ex. H, ECF No. 37-9 at 377; 2018 Suppl. Admin. R. 384, Pl.'s Ex. A, ECF No. 55 at 1705). The earnings report also shows Mr. Reid earned $29.20 with Harold F. Mollenauer in 1965. (2013 Admin. R. 177, ECF No. 37-8 at 334). Diving that total by $3.65 produces the 8 hours Mr. Reid claims with Harold F. Mollenauer. (2013 Admin. R. 220, Pl.'s Ex. H, ECF No. 37-9 at 377; 2018 Suppl. Admin. R. 384, Pl.'s Ex. A, ECF No. 55 at 1705). Mr. Reid claims a total of 457 hours for all three 1965 employers and a corresponding total of 0.4 years of service credit. (2018 Suppl. Admin. R. 384, Pl.'s Ex. A, ECF No. 55 at 1705).

When confronted with the accuracy of Mr. Reid's calculations, and notwithstanding an earlier assumption of "the accuracy of Reid's pre-merger wage rates and possible hours" (*Id.* at 280, 1601), the Trustees backtrack by stating, "the wage reconstruction is less accurate than contemporaneous records of the Local 1275 Plan as the collective bargaining agreement has multiple wage rates for different types of work and wages do not translate directly to hours worked during overtime." (*Id.* at 401, 1722). This newfound approach is problematic for several reasons. To begin with, it is inconsistent with the Trustees' previous acceptance of the pre-merger rates. Likewise, it demonstrates a further inconsistent application of standards. The Trustees use the Local 1275 wage rate letter when it befits their position and cast it aside when it does not. Moreover, it ignores the lack of pre-1974 records of the Local 1275 Plan while generally referencing contemporaneous plan documents. Finally, it provides no specific evidence to support such an assertion while dismissing detailed contrary evidence.

The Trustees further focus their attention on the location of Mr. Reid's work and whether contributions were paid on his behalf. The Trustees rely on the absence of documents to prove their general explanation that "contractors . . . simply did not pay pension contributions for work in areas of other locals whose contracts did not then require pension contributions . . . regardless of whether Participant was referred to work in other areas by Local 1275." (*Id.*). Although a strong assertion, the Trustees provide no evidence on which to base it, as there are no surviving Local 1275 contracts for the period at issue.

Despite Mr. Reid proving he was paid Local 1275 wage rates for his "out of area" work, the Trustees summarily aver that any work Mr. Reid performed outside of the Local 1275 area was not eligible for reciprocal credit. (*Id.* at 398, 1719). Before ERISA's enactment, reciprocity agreements existed, allowing plan participants to work outside their home local union's jurisdiction and still earn pension credit.[5] The 1976 Local 1275 Plan contained an article outlining eligibility for reciprocal benefits, but the effective date of this article is unclear. (2013. Admin. R. 1023–25, ECF No. 37-10 at 408–10). For purposes of its analysis, the Board of Trustees assumed an effective date of 1967. (2018 Suppl. Admin. R. at 278, ECF No. 55 at 1599). It appears this assumption was made because the 1971 Industry Plan had a reciprocal credit article, effective 1967. (*Id.*). Section 9.6 of the 1976 Local 1275 Plan states, "It is specifically recognized that a Participant may have Past Service employment that would have been creditable under this Plan except for his failure to be entitled to Past Service Credit as set forth in Article 1.6 of the Plan." (2013. Admin. R. at 1023, ECF No. 37-10 at 408). Article 1.6 indicates that "Credited Past Service" includes union membership prior to May 1, 1963. (*Id.* at 1001, 386). A joint reading of Section 9.6 and Article 1.6 suggests that the 1976 Local 1275 Plan recognized reciprocal credit for

---

[5] Michael A. Evans & Jamie L. Reyes-Jones, *Understanding Reciprocity Agreements*, BENEFITS MAGAZINE, Aug. 2017, at 22, 24.

past service employment after 1963, which would include Mr. Reid's 1965 service. Other sections within Article 9 also recognize past service credit under the jurisdiction of the Local 1275 Collective Bargaining Agreement. (*Id.* at 1024, 409).

While the Trustees state that reciprocal credit would depend on employer contributions to one of the reciprocal plans, they also put forth the generalization that not all employers immediately joined the Industry Plan in 1967, as it was more common to contribute initially to the home area. (*Id.* at 279, 1600). This sweeping statement fails to cite any specific evidence to support it, and it is made with reference to the Industry Plan and not the Local 1275 Plan. (*Id.*). The Trustees then offer the conclusory statement that, "The existing records do not support enough reciprocal credit for Reid's work outside the Local 1275 Plan to get him close to vesting." (*Id.*). This statement also lacks any specific evidence to support it. According to Section 9.8(b) of the 1976 Local 1275 Plan, Mr. Reid would need to accumulate at least one year or 1,000 hours under the jurisdiction of the collective bargaining agreement to be eligible for reciprocal benefits. (*Id.* at 409, 1024). As Mr. Reid claims over 1,000 hours for 1968 alone, he appears to have the necessary hours to fulfill this requirement. (*Id.* at 384, Pl.'s Ex. A, 1705).

Defendant IUPAT cannot provide any Local 1275 records to substantiate its claim that Mr. Reid's 1965 employers failed to contribute on his behalf or that he was not entitled to reciprocal credit under the Local 1275 Plan. The Court also assesses the inconsistent application of standards and the selective picking of the available evidence when evaluating the Trustees' decision-making process. After considering these factors, the Court finds that the Trustees' decision to not award Mr. Reid service credit is not based on a reasoned analysis and is not supported by substantial evidence.

### c. Military Service

Mr. Reid further attests he joined the military in 1966, was discharged from the military in February 1968 and returned to painting within ten days of his discharge. (2018 Suppl. Admin. R. 379, Reid Aff. ¶¶ 10–12, ECF No. 55 at 1700). According to his earnings report, he was first paid by the military during the first quarter of 1966. (2013 Admin. R. 177, ECF No. 37-8 at 334). His earnings report also indicates he was last paid by the military during the first quarter of 1968 and received less than he earned during previous quarters, signifying he did not work through the quarter end date of March 31. (*Id.*). As outlined in his earnings report, he worked for Local 1275 employer, Martin Painting, during the first quarter of 1968. (*Id.* at 176, 333). Mr. Reid's IUPAT member history also shows a return date of March 23, 1968. (2013 Admin. R. 19, ECF No. 37-6 at 176).

The 1976 Local 1275 Plan contemplates absence from union employment due to military service as a "special service." (2013 Admin. R. 1003, ECF No. 37-10 at 388). If the employee returned to union employment within ninety days after completing his military service, the employee did not suffer a break in service. (*Id.*). In its denial letter, the Board of Trustees states that if Mr. Reid was employed by a union employer subject to a collective bargaining agreement as provided for in Section 1.3 of the Local 1275 Plan prior to his military absence and returned to another covered union employer upon his return, then the "special service" provision of the Local 1275 Plan would be triggered. (2018 Suppl. Admin. R. 276, ECF No. 55 at 1597). Yet the Board of Trustees further states that Mr. Reid did not timely report his military service, as required by Section 1.23(a), and thus fell short of triggering the special service exception. (*Id.*). The Trustees point to Mr. Reid's Local 1275 service record as evidence of Mr. Reid's alleged failure to report his service, but the Trustees neglect to provide any details of their purported evidence. (*Id.*). As

the Court previously observed, flatly stating that Mr. Reid's claims are contradicted by plan records without providing substantial evidence to support these assertions does not provide a reasoned analysis. (*See* Op. & Order 14, ECF No. 43 at 1463).

The Court also notes the Board of Trustees' inconsistent application of standards with respect to the 1976 Local 1275 Plan. The Trustees are sometimes willing, as with Mr. Reid's special service, to adhere to the terms of the 1976 Local 1275 Plan and not raise the lack of an effective date of the applicable provision. In other instances, the Trustees take issue with the effective date of certain sections under which Mr. Reid could significantly benefit, such as those awarding reciprocal credit. Such cherry-picking to suit a particular outcome demonstrates a selective review of the available evidence and a lack of reasoned analysis of the contents of the administrative record.

The available administrative record evidence proves Mr. Reid's entitlement to military service credit. Mr. Reid provided multiple sworn statements attesting to his dates of service and discharge. (2013 Admin. R. 189, Reid Aff. ¶¶ 6–7, ECF No. 37-8 at 346; 2018 Suppl. Admin. R. 379, Reid Aff. ¶¶ 11–12, ECF No. 55 at 1700). His earnings report also corroborates both his timeline and claimed employers. (2013 Admin. R. 176–77, ECF No. 37-8 at 333–34). Plan records further support Mr. Reid's claim, as his IUPAT member history record demonstrates he returned to Local 1275 during the month following his discharge from the military and before ninety days had elapsed. (2013 Admin. R. 176, ECF No. 37-6 at 176). The evidence establishes that Mr. Reid met the requirements of the special service exception under the terms of the Local 1275 Plan and did not incur a break in service. Considering all of the circumstances surrounding his 1965 employment, this Court finds that Mr. Reid is entitled to 0.4 years of service credit for 1965.

### 2. 1968

Mr. Reid's claimed employers for 1968 are Bohl Painting and Martin Painting. (2013 Admin. R. 211–12, ECF No. 37-9 at 368–69). His earnings report shows he worked for Martin Painting during every quarter of that year. (2013 Admin. R. 176, ECF No. 37-8 at 333). His earnings report also shows he worked for Bohl Painting during the third quarter of 1968. (*Id.* at 177, 334). Defendant IUPAT does not dispute that both employers were named as contributing union employers as of the merger date. (Oral Arg. Tr. 30:3–17). The Board of Trustees also does not appear to take issue with Mr. Reid's work with Bohl Painting during 1968, as neither the draft memorandum nor final denial letter detail why Mr. Reid's employment with Bohl Painting should be discredited other than a flat assertion that Mr. Reid worked for Local 555, not Local 1275, from 1965 to 1968. (2018 Suppl. Admin. R. 274, ECF No. 55 at 1595). The Trustees once again mistakenly rely on Mr. Reid's deposition to support this assertion. (*Id.*). According to the Trustees, Mr. Reid worked outside of the jurisdiction of Local 1275 during 1968. (*Id.*). Yet only Martin Painting is identified in conjunction with this statement. (*Id.*).

Mr. Reid has never been a member of Local 555. (2018 Suppl. Admin. R. 379, 387, Reid Aff. ¶ 9, Hiles Aff. ¶ 3, ECF No. 55 at 1700, 1708). He does explain, though, that while he always performed work under the auspices of Local 1275, union painters often performed work outside of the geographic jurisdiction of Columbus. (*Id.* at ¶ 13). Mr. Reid specifically addresses the central Ohio rules governing out-of-town painting during the 1960s and 1970s and how these rules affected his work with Martin Painting. (*Id.* at ¶¶ 15–16). Mr. Reid clarified that if Local 1275 painters were hired by a Local 1275 contractor to perform short-term out-of-town painting jobs, union painters were hired as Local 1275 painters and paid the wage rate established by Local 1275. (*Id.* at ¶ 15). Mr. Reid further explained that Martin Painting was awarded a contract in 1968 to

paint all Phillips 66 gas stations in Ohio, northern Kentucky, and northern West Virginia and hired Local 1275 painters to perform the work. (*Id.* at ¶ 16). According to Mr. Reid, Martin Painting paid the union painters the applicable Local 1275 wage rate and any corresponding pension contributions. (*Id.*). Thus, Mr. Reid concludes that his 1968 work was considered Local 1275 work. (*Id.*).

Mr. Reid's affidavit testimony is corroborated by his earnings report. According to his earnings report, Mr. Reid earned a total of $4,484.15 with Martin Painting in 1968. (2013 Admin. R. 176, ECF No. 37-8 at 333). Mr. Reid previously stated his 1968 wage rate was $4.02 ½ per hour and calculated he should be credited with 1,115 hours. (*Id.* at 193, Reid Aff. ¶ 34, 350). Using the Local 1275 wage rate letter and the applicable 1968 wage rate of $4.22, this provides Mr. Reid with an estimated 1,063 hours with Martin Painting, which is not far from Reid's claimed 1,115 hours, and equates to his claimed 1.0 years of service credit either way. Similarly, Mr. Reid claims 37 hours with Bohl Painting. If his total 1968 wages with Bohl Painting of $149.10 (*Id.* at 177, 334) are divided by $4.22, his hours equate to 35, which is very close to his previously claimed total of 37 hours. Adding these hours to his Martin Painting hours does not increase his service credit, as 1.0 years is the total maximum credit available, but it does prove the veracity of his claim that he was paid Local 1275 wage rates during 1968.

As the Board of Trustees never specifically address why Mr. Reid is not entitled to any 1968 service credit with Bohl Painting, the Trustees' decision to deny his claim for those hours lacks substantial evidence. Moreover, IUPAT's conclusory assertions concerning any "out of area" work fail to rebut the contrary evidence proffered by Mr. Reid in support of his claim for 1.0 years of service credit in 1968. As discussed above, the Trustees' reliance on the absence of pre-merger Local 1275 records to serve as evidence refuting Mr. Reid's claim, does not provide a

reasoned analysis to deny his claim for service credit. Therefore, this Court finds that Mr. Reid is entitled to 1.0 years of service credit for 1968.

### 3. 1969–1970

#### a. Martin Painting

Neither IUPAT's draft memorandum nor the final determination letter addresses why Mr. Reid did not receive credit for either his 1969 or 1970 work for Martin Painting.[6] Mr. Reid's earnings report shows he earned $1,436.35 with Martin Painting in 1969. (2013 Admin. R. 176, ECF No. 37-8 at 333). Dividing his total earned wages by the Local 1275 1969 wage rate of $4.55 (*Id.* at 282, Ex. 1, 1603), provides Mr. Reid with over 300 hours and corroborates his claim of 0.3 years. Due to the lack of substantial evidence supporting the Trustees' denial, the Court finds Mr. Reid should be credited with the 0.3 years he claims with Martin Painting in 1969. (*Id.* at 384, Pl.'s Ex. A, 1705). Applying the same rationale to Mr. Reid's total earned wages with Martin Painting in 1970 of $676.75 and the Local 1275 wage rate of $5.80, Mr. Reid worked 116 hours. Therefore, Mr. Reid should be further credited with 0.1 years with Martin Painting in 1970.

#### b. HT Andrews

The Trustees take issue with Mr. Reid's 1970 work for employer HT Andrews, as they declare that these hours were performed in Dayton, Ohio, and within the jurisdiction of another union, Local 249. (2018 Suppl. Admin. R. 274, ECF No. 55 at 1595). Again, the Trustees mistakenly rely on Mr. Reid's deposition to prove this assertion. (*Id.*). While Mr. Reid admits HT Andrews was a Dayton-area union contractor, he maintains the work was performed in Local 1275's jurisdiction because HT Andrews's awarded contracts were for painting at the Southwest

---

[6] During oral argument, IUPAT's counsel offered the following rationale, " . . . no indication he's working in the 1275 area with the contribution obligation." (Oral Arg. Tr. 30:25, 31:1). Counsel later admitted there was no testimony regarding this alleged "out of area" work. (*Id.* at 32:12–13, 25).

City Schools in Grove City and at Westland High School in Columbus. (*Id.* at 381, Reid Aff. ¶ 24, ECF No. 55 at 1702). Mr. Reid further maintains he was hired for both jobs through Local 1275. (*Id.*).

The administrative record provides evidence that Mr. Reid was working within Local 1275's geographic jurisdiction, and that HT Andrews was making contributions for his work. (*Id.* at 349, Ex. 8, 1670). On remand, the Trustees located a copy of a collective bargaining agreement whereby HT Andrews agreed to pay benefits to IUPAT workers effective June 1, 1968. (*Id.*). During their subsequent review of Mr. Reid's claim, the Trustees were willing to apply Industry Plan effective dates to Local 1275 agreements. (*See, e.g.,* 2018 Suppl. Admin. R. 278, ECF No. 55 at 1599 discussing reciprocal credit). Using a consistent approach, the Trustees should have reasonably concluded that contributions were made on Mr. Reid's behalf for his 1970 work with HT Andrews.

Though Mr. Reid claims 667 hours with HT Andrews (*Id.* at 384, Pl.'s Ex. A, 1705), his 1970 earnings report total of $3,701.20 and the Local 1275 wage rate of $5.80 produce a total of 638 hours. (2013 Admin. R. 178, ECF No. 37-8 at 335; 2018 Suppl. Admin. R. 282, Ex. 1, 1603). Adding his 638 HT Andrews hours to his 116 hours with Martin Painting does not produce the 0.8 years of service credit he claims (2018 Suppl. Admin. R. 384, Pl.'s Ex. A, 1705), but instead provides him with a total of 754 hours and a corresponding 0.7 years of service credit. As the Court finds the Trustees did not engage in a reasoned deliberation supported by substantial evidence, the Court further finds that Mr. Reid is entitled to 0.7 years of service credit for 1970.

### 4. 1971 and 1973

After performing a wage reconstruction using Mr. Reid's total earnings in 1971 and 1973 (2013 Admin. R. 176, 178 ECF No. 37-8 at 333, 335) and the wage rate letter (2018 Suppl. Admin.

R. 282, ECF No. 55 at 1603), the Trustees gave Mr. Reid credit for 0.2 years in 1971 and 0.8 years in 1973. (2018 Suppl. Admin. R. 399, ECF No. 55 at 1720). The Trustees did not give Mr. Reid the 0.3 years he claimed for 1971 because, when dividing his total 1971 income of $1,724.13 by the 1971 wage rate of $7.20, this gives Mr. Reid 239 hours instead of his claimed 310 hours, resulting in only 0.2 years of service credit. The Court finds that the Trustees' decision to award Mr. Reid 0.2 years of service credit is properly supported by substantial administrative record evidence, and Mr. Reid is therefore only entitled to 0.2 years of service credit for 1971.

The Trustees determined that Mr. Reid was not entitled to the 1.0 years he claimed for 1973 because 212 of the 1,106 hours claimed for that year were performed outside of Columbus, Ohio, at Camp Perry, Ohio, for Local 1275 member Werner Maintenance. (*Id.* at 274, 1595). Once again, the Trustees incorrectly rely on Mr. Reid's deposition to make this determination. (*Id.*). In his second affidavit, Mr. Reid maintains that his Werner Maintenance hours were contracted through Local 1275. (*Id.* at 381, Reid Aff. ¶ 26, 1702). Werner Maintenance also shows an effective date of 1979 on the IUPAT/Local 1275 collective bargaining agreement which, according to the Trustees and applied consistently, indicates Werner Maintenance made pre-merger contributions. (*Id.* at 319, 1640). Using Mr. Reid's total income earned with Werner Maintenance in 1973 of $5,667.47 (2013 Admin. R. 178, ECF No. 37-8 at 335) and dividing that number by the Local 1275 wage rate of $8.45 (2018 Suppl. Admin. R. 282, Ex. 1, ECF No. 55 at 1603), the Court finds Mr. Reid worked approximately 671 hours with Werner Maintenance.

The Trustees do not take issue with the hours Mr. Reid claims for Robinson Associates and Martin Painting[7] for 1973. (*Id.* at 274, 1595). Performing similar calculations for Mr. Reid's work with these employers (*Id.*; 2013 Admin. R. 176, 179, ECF No. 37-8 at 333, 336), the Court finds

---

[7] During oral argument, IUPAT's counsel stated, " . . . we just gave him – had given him the Martin time." (Or. Arg. Tr. 44:7).

Mr. Reid worked 37 hours for Robinson Associates and 143 hours for Martin Painting. Together with the 671 hours with Werner Maintenance, this yields a total of 851 hours of work for which he should receive 0.8 years of service credit. Though the Court disagrees with the evidence relied on by the Trustees, the outcome remains the same. Therefore, Mr. Reid is entitled to 0.8 years of service credit for 1973.

### 5. 1977

The only remaining year in dispute is 1977. To determine Mr. Reid's pre-merger service, the Trustees relied on the Local 1275 work history card summarizing his 1974–1978 service. (2018 Suppl. Admin. R. 399, ECF No. 55 at 1720). The work history card is an illegible microfiche copy that even IUPAT's counsel admits having uncertainty as to how to read. (*Id.* at 272, 1593). During the parties' oral argument, the Court also could not read it and asked the parties to calculate Mr. Reid's entitlement for 1977 using other evidence available in the administrative record. (Or. Arg. Tr. 44:10–46:23). Using Mr. Reid's earnings report and the applicable wage rate for that year, the Court determined Mr. Reid was entitled to 0.7 years of service credit for 1977. (*Id.* at 46:7, 23). Based on this calculation and the Court's inability to decipher the alleged contrary evidence referred to by the Trustees, the Court finds the Trustees did not conduct a reasoned deliberation supported by substantial evidence. Mr. Reid is entitled to 0.7 years of service credit for 1977.

### B. Mr. Reid's Revised Service Record

After reviewing all of the available evidence contained in the administrative record, the Court finds Mr. Reid is entitled to the following service credit prior to his departure from union painting in 1982:

| Year | Employers | Hours Credited | Credit Given |
|------|-----------|----------------|--------------|
| 1965 | Martin Painting<br>Harold F Mollenauer<br>General Maintenance &<br>Engineering | 457 | 0.4 |
| 1966-67 | Military | | |
| 1968 | Bohl Painting<br>Martin Painting | 1,098 | 1.0 |
| 1969 | Martin Painting | 316 | 0.3 |
| 1970 | Martin Painting<br>HT Andrews | 754 | 0.7 |
| 1971 | Martin Painting | 239 | 0.2 |
| 1973 | Martin Painting<br>Robinson Assoc<br>Werner Maintenance | 851 | 0.8 |
| 1974 | Henry Painting<br>Rosendahl<br>Robinson Assoc<br>Zarbaugh Assoc | 2,286 | 1.0 |
| 1975 | Henry Painting<br>Mowery Decorating<br>Research Cottrell | 2,100 | 1.0 |
| 1976 | Henry Painting<br>Mowery Decorating | 1,578 | 1.0 |
| 1977 | Youngs Industrial<br>Ralph Rhoden | 786 | 0.7 |
| 1978 | Youngs Industrial<br>Columbus Bridge | 1,553 | 1.0 |
| 1979 | Youngs Industrial | 1,093 | 1.0 |
| 1980 | Youngs Industrial | 755 | 0.5 |
| 1981 | Youngs Industrial | 254 | 0.2 |
| 1982 | Youngs Industrial | 407 | 0.4 |
| **TOTAL** | | | **10.2** |

Therefore, under the terms of the Local 1275 Plan, Mr. Reid completed at least ten years of credited vested service. He became a Vested Participant prior to his 1982 departure and should have retained any pension credits previously earned when he returned to union painting in 1999.

## IV.     Conclusion

After giving IUPAT the deference it is entitled to, the Court finds that the Board of Trustees' decision to uphold Mr. Reid's denial of benefits was arbitrary and capricious. The Board of Trustees acted arbitrarily and capriciously in determining Mr. Reid was not entitled to benefits under the Local 1275 Plan when it undertook a selective review of the available administrative record evidence by inconsistently applying standards and ignoring credible, corroborated testimony and the documentation provided by Mr. Reid to support his claim for benefits. The Trustees also relied heavily on the absence of pre-1974 records in assessing Mr. Reid's entitlement to benefits rather than examining the available evidence. After considering the administrative record as a whole and the evidence the Trustees relied on in making their determination, the Court finds that the Trustees' decision was not the result of a principled reasoning process supported by substantial evidence. For these reasons and those earlier articulated**,** the Court **GRANTS** Plaintiff's Second Motion for Judgment on the Administrative Record (ECF No. 57) and **DENIES** Defendant's Renewed Motion for Summary Judgment (ECF No. 62).

District courts "have considerable discretion to craft a remedy after finding a mistake in the denial of benefits." *Elliott v. Metro. Life Ins. Co.,* 473 F.3d 613, 621 (6th Cir. 2006). Under these circumstances, "courts may either award benefits to the claimant or remand to the plan administrator." *Id.* Ordinarily, a plan's failure to make adequate findings or provide adequate reasoning prompts a district court to remand the case to the plan administrator for a full and fair

inquiry. *See id.* at 622. In this case, remand is not the appropriate remedy. The Court has already engaged in this exercise with the result outlined in this Opinion and Order and doing so once more would be futile. Therefore, the Court exercises its discretion to employ a different remedy.

The Court "also has the power, in appropriate cases, to award benefits to the . . . claimant." *Id.* at 621 (quoting *Buffonge v. Prudential Ins. Co. of Am.,* 426 F.3d 20, 31 (1st Cir. 2005)) (internal quotation marks omitted). The facts and circumstances of this case merit the award of benefits as the appropriate remedy. Therefore, IUPAT is directed to credit Mr. Reid with 10.2 years of vested service prior to his 1982 departure and pay him the pension benefits to which he is entitled, retroactive to the date of his pension application, with interest.

**IT IS SO ORDERED**.


/s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: February 8, 2019